# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:25-CR-00285-RP-1 |
| | ) | |
| JUSTIN GO | ) | |

## SENTENCING MEMORANDUM

Mr. JUSTIN GO, pursuant to Fed. R. Crim. P. 32(i)(1)(C), respectfully submits his position in support of a variant sentence.

## I.    Statutory Penalties

This Court shall consider "the kinds of sentences available."[1]

On June 26, 2025, Mr. Go pleaded guilty to one count of bank fraud in violation of 18 U.S.C. § 1344.[2] Count One is punishable by a term of imprisonment of not more than thirty years, a term of supervised release of not more than five years, and a fine of not more than $1,000,000 or twice the gain or loss amount.[3] There is no mandatory minimum term of imprisonment.

---

[1] 18 U.S.C. § 3553(a)(3).

[2] Information, ECF No. 1; Mins., ECF No. 13.

[3] 18 U.S.C. § 1344; Presentence Investigation Report ("PSR") ¶ 30, Sept. 24, 2025.

**II.    Sentencing Guidelines**

This Court "shall consider . . . the kinds of sentence[s] and sentencing range[s] established" by the sentencing guidelines.[4] Mr. Go maintains his objections to the sentencing guidelines range as calculated in the PSR; specifically, the application of the two-level adjustment pursuant to U.S.S.G. § 3B1.3 is inappropriate.

The Government has "the burden of establishing, by a preponderance of the evidence, the facts that would support the enhancement."[5] Mr. Go pleaded guilty to one count of bank fraud, which is

> . . . knowingly execut[ing], or attempting to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises . . . .[6]

Pursuant to the factual basis, Mr. Go admitted, *inter alia*, the following information:[7]

1. He was an employee of M1 working remotely.
2. B2 is a partner bank of M1.
3. He held the title "Manager of Banking Operations."

---

[4] 18 U.S.C. § 3553(a)(4).

[5] *United States v. Trujillo*, 502 F.3d 353, 357 (5th Cir. 2007) (citing *United States v. Hill*, 258 F.3d 355, 357 (5th Cir. 2001)).

[6] 18 U.S.C. § 1344

[7] Plea Agreement at 4–5, ECF No. 13.

4. When a customer received or sent a transfer with B2, he logged the information to show an accurate account balance with M1.
5. He could initiate wire transfers from B2 on behalf of M1 or its customers.

The factual basis, *i.e.*, the conduct to which Mr. Go has admitted, or the information in the PSR, must prove, by a preponderance of the evidence, that this Court should apply an adjustment to Mr. Go's Base Offense Level.[8]

U.S.S.G. § 3B1.3 states that, "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." In *United States v. Ollison*, the court employed a two-step test to determine whether § 3B1.3 applies.[9]

First, the court must determine whether the defendant occupied a position of trust at all. *If not, the inquiry ends and no enhancement accrues*. If, however, this initial query produces an affirmative response, the court must proceed to ascertain the extent to which the defendant used that position to facilitate or conceal the offense.[10]

Mr. Go submits that the factual basis does not establish by a preponderance of the evidence that he held a position of trust, and, even if he did, it does not establish that he used said position to significantly facilitate the commission or concealment of his crime under the same standard.

---

[8] *Trujillo*, 502 F.3d at 357

[9] *United States v. Ollison*, 555 F.3d 152, 166 (5th Cir. 2009) (citing *United States v. Reccko*, 151 F.3d 29, 31 (1st Cir. 1998)).

[10] *Id.* (emphasis added).

### a.    Mr. Go did not hold a position of trust.

"[A] position of public or private trust [is] characterized by professional or managerial discretion (*i.e., substantial discretionary judgment that is ordinarily given considerable deference*). Persons holding such positions ordinarily are subject to *significantly less supervision* than employees whose responsibilities are primarily non-discretionary in nature."[11]

"[B]ecause there is a component of misplaced trust inherent in the concept of fraud, a sentencing court *must be careful not to be 'overly broad'* in imposing the [§ 3B1.3] enhancement."[12] In other words, just because an entity gave the defendant certain privileges, trusting that the defendant would not use them to commit a crime, does not mean that the defendant held a position of trust.[13] The Sentencing Commission did not intend the enhancement to apply to every employee who is in a position to steal money from their employer.[14] An employee's job title is also insufficient— even if he or she holds a "manager"

---

[11] U.S.S.G. § 3B1.3, cmt. App. n. 1 (emphases added).

[12] *Ollison*, 555 F.3d at 166. (quoting *United States v. Garrison*, 133 F.3d 831, 838 (11th Cir. 1998)).

[13] *Id.*

[14] *Id.* (citing *United States v. Edwards*, 325 F.3d 1184, 1187 (10th Cir. 2003))

position, he or she must *functionally* be in a position of trust for the enhancement to apply.[15]

The necessary qualities of a position of trust are (1) the person holding the position is given "considerable" deference when making decisions, and (2) the person is subject to minimal supervision,[16] such that ". . . the position provides the freedom to commit a difficult-to-detect wrong."[17] An employee's wrongdoing is difficult to detect when a reasonably diligent supervisor is unable to discover the employee's behavior.[18] An employee also commits a difficult-to-detect wrong when entities or persons outside of the employee's place of work rely on the employee exercising their discretion, as they themselves are unable to confirm every decision the employee makes.[19]

---

[15] *Id.* at 167 (discussing *United States v. Tann,* 382 U.S. App. D.C. 267, 532 F.3d 868, 870–71 (D.C. Cir. 2008) (holding that the defendant did not hold a position of trust despite holding being an 'manager' because ". . . to apply the enhancement to a defendant merely because he or she is entrusted with valuable things and has little or no supervision while performing his or her duties would stretch the abuse-of-trust enhancement to cover endless numbers of jobs involving absolutely no professional or managerial discretion . . . .")

[16] *Id.* at 166.

[17] *United States v. Brown*, 7 F.3d 1155, 1161 (5th Cir. 1993) (quoting *United States v. Hill*, 915 F.2d 502, 506 (9th Cir. 1990)).

[18] *Id.* (citing *United States v. Helton*, 953 F.2d 867, 870 (4th Cir. 1992))

[19] *United States v. Miller*, 607 F.3d 144, 149 (5th Cir. 2010) (holding that a defendant abused a position of trust where government entities relied on her accurately reporting her patients' needs to distribute funds "because the State lacks the resources necessary to monitor all submitted claims").

Here, the factual basis does not prove by a preponderance of the evidence that Mr. Go held a position of trust. Even if this Court were to accept the Government's conclusory statements in its Response as facts, it still does not demonstrate how Mr. Go's position was one in which his discretion and minimal supervision made it difficult to detect his wrongdoing.[20]

One way to determine if the defendant's position made wrongdoing difficult to detect is whether a reasonably diligent supervisor would have been unable to discover the behavior.[21] Any supervisor, diligent or not, could easily discover what Mr. Go was doing because he logged *every single transaction* in his employee profile and his personal account, which was held at M1.[22] A single glance at the account balances and the corresponding transactions would reveal Mr. Go's wrongdoing. There was nothing complex or difficult to detect about his conduct; he, quite literally, took money from his employer and put it in his personal account. This is akin to a bank teller taking cash from a bank's cash stores and not reporting the withdrawal in the bank's database or using the bank's wire information to transfer funds into a personal account held at the

---

[20] Gov't Resp. in Opp'n to Def.'s Obj. to the PSR ("Response"), Sept. 17, 2025.

[21] *Brown*, 7 F.3d at 1161.

[22] The Government may argue that it took a full year for the employer to discover the conduct, indicating that the conduct was not readily discoverable. However, the length of time an employer takes to notice wrongdoing has no bearing on whether the wrongdoing was readily discoverable. *Brown*, 7 F.3d at 1161 (citing *United States v. Helton*, 953 F.2d 867, 870 (4th Cir. 1992) ("lax supervision alone does not convert one's job into a 'position of trust' under § 3B1.3.")

same bank. In fact, since Mr. Go's transactions are online and highly visible on

the bank's systems, his conduct was easier to detect than a withdrawal of cash

from a bank's stores. Put simply, it was not a position of trust because any

reasonable employer could have discovered it.[23]

Fifth Circuit courts have also held that an employee's wrongdoing is

difficult to detect where entities outside of the employee's place of work rely on

the employee exercising their discretion because they are incapable of checking

in on most of the decisions that the employee makes.[24] For example, insurance

companies rely on physicians to exercise proper discretion when billing for

necessary patient treatments, as they receive thousands of claims and lack the

requisite medical knowledge to ascertain if they are legitimate.[25] In contrast, no

one outside of the company for which Mr. Go worked and its related companies

relied on Mr. Go's accurate accounting, unlike the separate private insurance

companies' reliance on a doctor. Any person with basic addition and subtraction

---

[23] The Government, in its Response, makes the conclusory statement that Mr. Go hid his offense conduct because of his position of trust; however, the Probation Officer correctly writes in the PSR that Mr. Go made no efforts to conceal his behavior. *See* PSR, ¶ 12, Sept. 24, 2025 ("there is no information that he took, or caused important steps to be taken, to conceal and continue his fraudulent activities without detection.") That said, even if Mr. Go did attempt to conceal his behavior, this does not automatically mean that the Government can apply this enhancement. *See Ollison*, 555 F.3d at 167.

[24] *United States v. Miller*, 607 F.3d 144, 149 (5th Cir. 2010) (holding that a defendant abused a position of trust where government entities relied on her accurately reporting her patients' needs to distribute funds "because the State lacks the resources necessary to monitor all submitted claims").

[25] *United States v. Iloani*, 143 F.3d 921, 922–3 (5th Cir. 1998)

skills could see that Mr. Go was illegally transferring money, whereas an insurance provider would not have the medical knowledge to verify if a patient needed a particular treatment. Similarly, a durable medical equipment (DME) provider was in a position of trust where she submitted false claims to Medicare and Medicaid, because (1) she managed actual employees and instructed them to help her with the scheme—showing managerial discretion—and (2) she owned the medical supply company and was one of the last lines of defense against fraudulent billing claims to the government, which was unable to scan each of the thousands of claims they received for legitimacy.[26] Mr. Go was not the last line of defense against fraudulent activity in the company, unlike the DME company executive. He did not own M1 or control the behavior of other employees at the company. Thus, Mr. Go did not occupy a position of trust.

> **b.    Even if Mr. Go held a position of trust, it did not significantly facilitate his offense conduct.**

Even assuming *arguendo* that Mr. Go held a position of trust, the Government again makes conclusory statements to claim that Mr. Go's position significantly facilitated his offense, and yet again fails to meet its burden of proof for applying an enhancement.

First, "[t]o determine whether the position of trust 'significantly facilitated' the commission of the offense, the court must decide whether the defendant

---

[26] *Miller*, 607 F.3d 144, 149.

occupied a superior position, *relative to all people* in a position to commit the offense, as a result of her job."[27] No evidence in the factual basis or the PSR suggests that *no one else* was in a superior position to commit the instant offense. Other than the Government's conclusory statement that Mr. Go held a managerial and discretionary position at M1, and that no one else could have defrauded M1 in the same way, there is no evidence that Mr. Go was managing other people and was afforded any discretion whatsoever, other than to initiate a simple wire transfer where necessary for the company.

Second, to significantly facilitate the offense conduct, ". . . [the] position must not only provide the opportunity to defraud, but also significantly facilitate its commission or concealment."[28] To reiterate, Mr. Go's job responsibilities included managing data and initiating wire transfers as necessary. These job responsibilities are not significantly different than those of a bank teller, whose responsibilities include, *inter alia,* data entry, managing wire transfers for bank customers, opening and closing bank accounts, and verifying whether a client has sufficient funds to make withdrawals.[29]  There is nothing unique about the information in Mr. Go's possession — many bank employees, including bank

---

[27] *United States v. Wright*, 496 F.3d 371 376 (5th Cir. 2007) (citation omitted).

[28] *United States v. Powers*, 168 F.3d 741, 752 (5th Cir. 1999).

[29] U.S. Bureau of Labor Statistics, *Tellers*, Occupational Outlook Handbook, https://www.bls.gov/ooh/office-and-administrative-support/tellers.htm

tellers, would have access to the same information and systems. Such commonplace, menial job responsibilities cannot rise to the level of "significantly facilitating" Mr. Go's offense. If this Court were to decide that Mr. Go's position significantly facilitated the offense, then any employee with access to the company debit card who stole money from their employer would fall under this enhancement, or any bank teller who used wire information at their disposal to steal money. As this enhancement was not meant to be "routinely applied,"[30] this Court should not apply it here.

### c.    The Government's response does not explain why Mr. Go should receive the enhancement under the applicable case law.

First, the Government argues that Mr. Go held a position of trust because he was promoted to "Manager of Banking Operations," and that ". . . he was subject to less supervision than those employees below him whose responsibilities were primarily non-discretionary in nature." [31] However, a mere title is insufficient to establish that a person held a position of trust.[32] Mr. Go must have *actually* been in a position of considerable deference with minimal supervision, which is not true, because Mr. Go's activities were tracked by the company system via his employee ID, which is how the fraud was discovered.[33]

---

[30] *Ollison*, 555 F.3d at 166.

[31] Gov't's Resp. in Opp. to Def's Obj. to PSR at 3, Sept. 17, 2025.

[32] *Ollison*, 555 F.3d at 167.

[33] PSR, ¶ 10 (Sept. 24, 2025).

Additionally, it is curious that neither the factual basis nor the PSR states that Mr. Go was "promoted" or that he moved into a senior position. The PSR states only that his job responsibilities changed, indicating a lateral shift within the company rather than a promotion to a higher rank.[34] In fact, the factual basis contains no information about Mr. Go's position relative to other employees, the level of discretion he was afforded, or how much he was supervised.[35] The Government's blatantly conclusory statements regarding the essential elements of the position of trust enhancement do nothing to prove, with a preponderance of the evidence, that it should apply to Mr. Go.

Second, the Government argues that Mr. Go held a position of trust because he had "access to M1's internal software system,"[36] which is a privilege, "that was not enjoyed by the general public."[37] As discussed above, mere access does not put a person in a position of trust.[38] M1 certainly "misplaced its trust" in Mr. Go when it gave him access to its internal systems and assumed that he would not use the information to steal money. However, misplaced trust is inherent in any fraud-related crime and thus does not justify an enhanced

---

[34] PSR, ¶ 48 (Sept. 24, 2025).

[35] *See generally* PSR (Sept. 24, 2025) and Plea Agreement, ECF No. 13.

[36] Gov't Resp. in Opp. to Def's Obj. to PSR at 3, Sept. 17, 2025.

[37] *Id.* at 4.

[38] *Ollison*, 555 F.3d at 166

sentence.[39] To compare, a bank teller has access to the bank's internal systems and wire information, which is not available to the general public; rather, these systems and wire information are accessible to an average bank employee. The bank trusts that the bank teller will not steal money from it or its customers, despite the bank teller's ability to do so. The Sentencing Commission uses bank tellers as a prime example of someone who does not hold a position of trust; they are an average bank employee. Thus, mere access does not justify the enhancement; therefore, it should not apply to Mr. Go, whose position did not afford him greater access or ability compared to that of the average bank employee.

Third, the Government argues that "consolidating wire information" put Mr. Go in a position of trust. The Government excludes the factual basis' definition of wire information consolidation, however, which states, "When a customer of M1 Finance received or sent a transfer through B2 Bank, Go was responsible for entering the transfer into M1 Finance's database to show the customer's receipt or debit of funds and an accurate balance."[40] Essentially, Mr. Go was performing the menial task of entering numbers from B2's database into M1's database and calculating the money added or subtracted from a bank

---

[39] *Id.*

[40] PSR, ¶ 7 (Sept. 24, 2025).

account to update the remaining balance. Data entry and basic math calculations are categorically simple tasks that are easily supervised, non-discretionary, and can be performed by any high school graduate. These tasks are akin to a bank teller recording the day's cash withdrawals into a bank's database and performing the necessary calculations to update the remaining balance.[41] They do not amount to a position of trust.

Fourth, the Government posits that Mr. Go ". . . also had authorization to initiate wire transfers from B2 Bank on behalf of his employer and its customers."[42] This job responsibility also fails to demonstrate that Mr. Go held a position of trust, as it is akin to having a company debit card with permission to make business-related purchases, which, based on applicable case law, does not amount to such a position.[43] Furthermore, the standard for applying the position of trust enhancement is not whether the defendant held the job responsibility, but the level of deference and supervision he received while performing it. That Mr. Go was authorized to initiate wires is insufficient unless he was given substantial deference and was unsupervised, making the scheme difficult to discover by a reasonable employer, which is untrue as discussed above.

---

[41] U.S. Bureau of Labor Statistics, *Tellers*, Occupational Outlook Handbook, https://www.bls.gov/ooh/office-and-administrative-support/tellers.htm

[42] Gov't's Resp. in Opp. to Def's Obj. to PSR at 3, Sept. 17, 2025.

[43] *Ollison*, 555 F.3d. at 167.

Fifth, the Government argues that Mr. Go's position is closer to that of a bank executive than to that of a bank teller.[44] A quick search of the job responsibilities for a bank teller and a bank executive shows that this is blatantly false. Mr. Go's job responsibilities included data processing and initiating wire transfers where appropriate.[45] A bank teller's responsibilities include, *inter alia,* data entry, managing wire transfers for bank customers, opening and closing bank accounts, and verifying whether a client has sufficient funds to make withdrawals.[46] A bank executive's responsibilities include developing strategies to ensure the bank's profitability, balancing the needs of multiple shareholders, monitoring adherence to applicable laws within the company, and making hiring and firing decisions.[47] On the scale from bank teller to bank executive, Mr. Go falls squarely on the side of bank teller.

In summary, the Government fails to meet its burden of proof to establish that Mr. Go held a position of trust that greatly facilitated the commission of Mr. Go's offense; therefore, this Court should sustain Mr. Go's objection to the PSR. Should this Court agree, the recommended guidelines range of imprisonment

---

[44] Gov't's Resp. in Opp. to Def's Obj. to PSR at 4, Sept. 17, 2025.

[45] PSR, ¶ 7 (Sept. 24, 2025).

[46] U.S. Bureau of Labor Statistics, *Tellers*, Occupational Outlook Handbook, https://www.bls.gov/ooh/office-and-administrative-support/tellers.htm

[47] Federal Deposit Insurance Corporation, *Statement Concerning the Responsibilities of Bank Directors and Officers* (Dec. 3, 1992), https://www.fdic.gov/regulations/laws/rules/responsibilities-bank-directors-officers.pdf

would be 27–33 months, based on a Total Offense Level of 18 and a Criminal History Score of I (0). Should this Court reject Mr. Go's objection to the PSR, Mr. Go submits that the same argument is grounds for a variance.

## III.    18 U.S.C. § 3553

### a.    Nature and Circumstances of the Offense and the History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))

Mr. Go is a loving partner to his long-term companion, Ms. Alicia Mabry, and a doting father to his eight-month-old son.[48] Ms. Mabry is unemployed and suffers from severe anxiety, and Mr. Go provides her with emotional and financial support.[49] She came to the union with three children from her former spouse; those children split their time between the two households.[50] Mr. Go deeply regrets how his actions have affected his loved-ones, who rely on him for financial support.

### b.    Need to Afford Adequate Deterrence to Criminal Conduct (18 U.S.C. § 3553(a)(2)(B))

Criminologists have shown that harsher sentences generally do not deter the public from committing crimes; instead, the certainty of being caught has a more significant deterrent effect.[51] Mr. Go's arrest and conviction will be the most

---

[48] PSR, ¶¶ 39–41 (Sept. 24, 2025).

[49] *Id.*

[50] *Id.*

[51] Charles E. Loeffler & Daniel S. Nagin, *The Impact of Incarceration on Recidivism*, 5 Ann. Rev. of Crim. 133–152 (2022).

deterrent factor in this case to prospective criminals, not the length or severity of his sentence.[52] A sentence substantially below the sentencing guidelines range will suffice for general deterrence.

### c.    Need to Protect the Public from Mr. Go's Future Criminal Conduct (18 U.S.C. § 3553(a)(2)(C))

Mr. Go, upon his release from imprisonment, will be in a demographic with the lowest rates of recidivism. Among all federal offenders released in 2010, only 4% were re-arrested for fraud charges.[53] Offenders with relatively higher levels of education are associated with lower recidivism rates; while offenders who did not graduate from high school have recidivism rates of 60%, those with a college degree have recidivism rates of only 19%.[54] Mr. Go has a college degree from the Georgia Institute of Technology and, thus, is in a demographic group with lower recidivism rates.[55]  Statistically, Mr. Go is unlikely to commit another crime.[56] Therefore, a sentence below the guidelines will suffice for specific deterrence.

### d.    Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment (18 U.S.C. § 3553(a)(2))

---

[52] *Id.*

[53] Kim Steven Hunt & Robert Dumville, *U.S. Sent'g Comm'n, Recidivism Among Federal Offenders: A Comprehensive Overview*, 23 (2016).

[54] *Id.* at 24.

[55] PSR, ¶ 46.

[56] *Id.*

Mr. Go, regardless of the length of his custodial sentence, will experience lifelong consequences from being sentenced for a federal crime.

First, federal offenders face severe socioeconomic consequences from incarceration; on average, people who served sentences of imprisonment experienced a 52% decrease in subsequent annual earnings.[57] This means that should this Court order even a short term of imprisonment, Mr. Go and his family will suffer lifelong financial consequences. These consequences would reflect the seriousness of the offense.

Second, Mr. Go was the primary provider for his partner and minor child. Parental incarceration does not just punish the parent; it also punishes the children. Mr. Go will have to live with the knowledge that he likely will miss his child's first steps and words while in custody. Mr. Go's child will likely face challenges as well. Studies have shown that children with incarcerated parents suffer emotionally, financially, and educationally.[58] That Mr. Go will have to work to rebuild his family emotionally and economically for the rest of his life—regardless of the length of his custodial sentence—likewise reflects the seriousness of the offense.

---

[57] Terry-Ann Craigie, *et al.*, *Conviction, Imprisonment, and Lost Earnings: How Involvement with the Criminal Justice System Deepens Inequality*, Brennan Center for Justice, N.Y.U. (2020).

[58] Eric Martin, *Hidden Consequences: The Impact of Incarceration on Dependent Children*, 278 Nat'l Inst. J. (2017).

Third, a sentence below the sentencing guidelines range would promote respect for the law. Mr. Go has been on pretrial and presentence supervision since June of 2025, and the pretrial services officer has reported no violations.[59] He has complied readily with all conditions of release and has demonstrated a significantly improved respect for the law through his behavior. Mr. Go is a non-violent, first-time offender; a sentence substantially below the sentencing guidelines range would provide just punishment and would meet the requirements of 18 U.S.C. § 3553(a)(2)(A).

### e.    Substance Abuse and Mental Health Treatment or Vocational Training (18 U.S.C. § 3553(a)(2)(D))

Mr. Go will participate in any self-development opportunities, in or out of custody, that this Court deems appropriate.

### f.    Need to Avoid Unwarranted Sentencing Disparities (18 U.S.C. § 3553(a)(6))

Mr. Go submits that a sentence substantially below the sentencing guidelines range is necessary to avoid an unwarranted sentencing disparity. Should this Court sustain Mr. Go's objection to the PSR, his Total Offense Level

---

[59] PSR, ¶ 5.

will be 18.[60] During the last five fiscal years (FY2020-2024), there were 690 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 18 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure.[61] For the 620 defendants (90%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment was 19 months, with a median length of 18 months.[62]

Furthermore, among federal offenders sentenced for theft, property destruction, or fraud, only 41.4% received a sentence within the guidelines range.[63] 56.3% of defendants received either a downward departure or downward variance.[64] Of those defendants who received a downward variance, the average sentence reduction was 57%.[65] In essence, given that over half of the

---

[60] Mr. Go submits that, should this Court reject his PSR objection, he will have a Total Offense Level of 20. During the last five fiscal years, there were 675 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 20 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 632 defendants (94%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment was 25 months, and the median length was 27 months. U.S. Sent'g Comm'n, *Judiciary Sentencing INformation*, https://jsin.ussc.gov/analytics/saw.dll?Dashboard.

[61] U.S. Sent'g Comm'n, *Judiciary Sentencing INformation*, https://jsin.ussc.gov/analytics/saw.dll?Dashboard.

[62] *Id.*

[63] U.S. Sent'g Comm'n, *Quickfacts: Theft, Property Destruction, and Fraud,* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Theft_Property_Destruction_Fraud_FY24.pdf

[64] *Id.*

[65] *Id.*

defendants of Mr. Go's offense type received a lower sentence than their recommended guidelines range, issuing a within-guidelines sentence for Mr. Go has the potential to cause national sentencing disparities.

## IV.    Recommended Designation

Mr. Go respectfully requests that this Court recommend to the Federal Bureau of Prisons that he be designated to serve any term of imprisonment at Federal Correctional Institution Bastrop's minimum-security satellite camp, which is within close proximity to his immediate family.

## V.    Conclusion

Mr. Go, based on the foregoing assertions and argument, prays that this Court issue a variant sentence.

Date:         November 10, 2025

Respectfully Submitted,

***s/ Katryna Lyn Spearman***
Katryna Lyn Spearman, Esq.
Ga. Bar # 616038
kspearman@lowtherwalker.com

***s/ Joshua Sabert Lowther***
Joshua Sabert Lowther, Esq.
Ga. Bar # 460398
jlowther@lowtherwalker.com

Lowther | Walker LLC
101 Marietta St. NW, Ste. 3650
Atlanta, Georgia 30305
O 404.496.4052 | F 866.819.7859
www.lowtherwalker.com

Attorney for Defendant
Justin Go

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:25-CR-00285-RP-1 |
| | ) | |
| JUSTIN GO | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2025, I electronically filed the foregoing SENTENCING MEMORANDUM with the Clerk of the United States District Court for the Western District of Texas by way of the CM/ECF system, which automatically will serve this document on the attorneys of record for the parties in this case by electronic mail.

Date:        November 10, 2025

Respectfully Submitted,

*s/ Katryna Lyn Spearman*
Katryna Lyn Spearman, Esq.
Ga. Bar # 616038
kspearman@lowtherwalker.com

Lowther | Walker LLC
101 Marietta St. NW, Ste. 3650
Atlanta, Georgia 30305
O 404.496.4052 | F 866.819.7859
www.lowtherwalker.com